UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANIEL M. PIERCE, and GREGORY BARTELL, on behalf of themselves and all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) ) |
| JON S. CORZINE, HENRI J. STEENKAMP, BRADLEY I. ABELOW, MICHAEL G. STOCKMAN, EDITH O'BRIEN, and J.P. MORGAN CHASE & CO., | ) ) ) ) ) ) ) |
| Defendants. | ) |

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

---

## CLASS ACTION COMPLAINT

The Plaintiffs, Daniel M. Pierce, Gregory Bartell, and Amira Damouni for themselves and as representative of a class of similarly situated consumers, by and through their attorneys, KRISLOV & ASSOCIATES, LTD., and for the Class Action Complaint against Defendants Jon S. Corzine, Henri J. Steenkamp, Bradley I. Abelow, Michael G. Stockman, Edith O'Brien, and J.P. Morgan Chase & Co.:

### NATURE OF THE CASE

1.     This is a class action arising under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*, Breach of Fiduciary Duty, Conversion, Aiding and Abetting Conversion, Common Law Fraud, Aiding and Abetting Common Law Fraud, violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et*

*seq.*, and Aiding and Abetting violations of RICO.  It is brought for the class of MF Global Holdings Ltd. ("MF Global" or "the Firm") customers who had commodities or futures accounts at the Chicago Mercantile Exchange ("CME") on October 31, 2011, when MF Global filed for bankruptcy and whose accounts were frozen.

2.      In the months leading up to the bankruptcy, Individual Defendants knowingly made misleading statements about MF Global's financial condition in the form of Securities and Exchange Commission filings, Sarbanes-Oxley Act financial certifications, and other pubic statements.

3.      Prior to the bankruptcy, Individual Defendants knowingly authorized, ordered, or assisted in the commingling and conversion of the Firm's commodities and futures customer funds.

4.      Defendant J.P. Morgan aided and abetted Individual Defendants in committing fraud, and converting money from customer accounts.

5.      All Defendants participated in a conspiracy with the purpose of converting MF Global customer funds, and paying these illegally acquired funds to Defendant J.P. Morgan.

## **JURISDICTION AND VENUE**

6.      Jurisdiction.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

7.      Venue.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), because during the Class Period Defendants transacted business and had agents in this District, and a substantial portion of the activities charged in this complaint were carried out in this District.

8.      This Court has personal jurisdiction over each Defendant, because each Defendant: transacted business in this District; had substantial contacts with this District; and committed over acts in furtherance of their fraud and illegal conspiracy in this District.  In addition, the Defendants acts were directed at and caused injury to customer accounts located in this District, and to person residing in, located in, or doing business in this District.

## THE PARTIES

9.      Plaintiff Daniel Pierce is a citizen and resident of the State of Illinois. Plaintiff contracted with MF Global Inc., a subsidiary of MF Global Holdings, to manage his futures and commodities trades in an MF Global Account.  Plaintiff Pierce's account was active prior to and on the day of MF Global's filing for bankruptcy.

10.      On October 24, 2011 Plaintiff Pierce requested a withdrawal of $20,000 from his MF Global account.  The check Plaintiff was issued by MF Global bounced, and the money remaining in his account was frozen following MF Global's filing for bankruptcy.

11.      Plaintiff Greg Bartell is a citizen and resident of the State of Illinois. Plaintiff contracted with MF Global Inc., a subsidiary of MF Global Holdings, to manage his futures and commodities trades in an MF Global Account.  Plaintiff Bartell's account was active prior to and on the day of MF Global's filing for bankruptcy.

12.      As of October 31, 2011 Plaintiff Bartell's commodities and futures account with MF Global was frozen, funds from his account are currently missing, and he is not able to withdraw his funds.

13.     Up to and until MF Global's bankruptcy, MF Global had a duty to keep Plaintiff Damouni's account funds segregated from the Firm's funds.

14.     Defendant Jon Corzine ("Corzine") served as MF Global's Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO") from March 23, 2010 until November 4, 2011.

15.     Defendant Henri J. Steenkamp ("Steenkamp") served as MF Global's Chief Financial Officer ("CFO") beginning in April 2011. Prior to becoming CFO, Steenkamp was MF Global's Chief Accounting Officer and Global Controller.

16.     Defendant Bradley I. Abelow ("Abelow") served as MF Global's President beginning in March 2011 and its Chief Operating Officer from September 2010.

17.     Defendant Michael G. Stockman ("Stockman") served as MF Global's Chief Risk Officer beginning in January 2011.

18.     Defendant Edith O'Brien served as MF Global's Assistant Treasurer throughout 2011, including at the time of MF Global's bankruptcy.  Defendant O'Brien personally oversaw and directed the transfers from MF Global customer accounts to MF Global proprietary trading accounts at J.P. Morgan Chase & Co.

19.     Defendants Corzine, Steenkamp, Abelow, Stockman and O'Brien are referred to as Individual Defendants.

20.     Defendant J.P. Morgan Chase & Co. ("J.P. Morgan" or "the Bank") served as MF Global's banker, a role that gave the Bank insight and control over MF Global's customer accounts.  J.P. Morgan and a coalition of other banks had lent MF Global about $1.3 billion in the week prior to MF Global's bankruptcy.  J.P. Morgan also acted as

middleman to MF Global sales of securities, specifically sales that MF Global was trying to make in its final days to raise money to avoid bankruptcy.

21.     Because of the Individual Defendants' positions with MF Global, they had access to undisclosed information about MF Global's business, operations, operational trends, financial statements, markets, present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

22.     Individual Defendants, because of their positions of control and authority as officers and/or directors of MF Global, were able to and did control the content of the various SEC filings, communications with FINRA, press releases, and other public statements and guarantees pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

23.     Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control or assist in the

illegal transfer of funds from customers' commodities and futures accounts, and the conversion of those funds for improper use by MF Global.

24.     Because of J.P. Morgan's knowledge about MF Global, stemming from its role as MF Global's banker, lender, and securities and commodities middleman, J.P. Morgan is liable for aiding and abetting MF Global's conversion of customer account funds, and for aiding and abetting the fraud on MF Global's customers.

25.     At all relevant times, MF Global was registered as a "futures commission merchant" with the Commodities Futures Trading Commission ("CFTC"), and was registered with the Chicago Mercantile Exchange.  MF Global is an interested party in this litigation, but is not named as a defendant herein because of the automatic stay provision pursuant to Section 362 of the U.S. Bankruptcy Code.  MF Global declared bankruptcy on October 31, 2011.

## **FACTUAL ALLEGATIONS**

26.     MF Global was the holding company for different subsidiary operations, one was a futures and commodities broker/dealer that held customer accounts, and another separate division invested funds on behalf of the Firm.

27.     At all relevant times, MF Global was registered as a Futures Commission Merchant ("FCM") with the Commodities Futures Trading Commission ("CFTC").

28.     As a registered FCM, the CFTC required MF Global to hold customer account funds separate ("segregated") from the Firm's own funds, and MF Global represented to Plaintiffs and the Plaintiff class that the Firm did, in fact, segregate customer funds.

29.     J.P. Morgan served as MF Global's bank, and MF Global held its customer accounts at J.P. Morgan.

30.     J.P. Morgan also served as a middleman for MF Global sales of securities. J.P. Morgan would take securities from MF Global and cash from the customer, and pass the securities and cash along when the sale was complete.

31.     <u>Defendant Individual's False and Misleading Statements</u>.  As early as 2010, MF Global's Chief Risk Officer, Michael Roseman, warned Defendant Corzine and others that the Firm did not have enough spare cash to withstand the risks of its investment positions, specifically investments in European Sovereign Debt.

32.     Individual Defendants ignored Roseman's warnings and continued to represent the Firm as financially sound.

33.     On May 19, 2011, MF Global held a conference call with analysts to discuss the Company's fourth quarter and fiscal year 2011 earnings. During the conference call, Defendant Steenkamp falsely stated:

> As Jon mentioned, we saw principal trading opportunities in European sovereigns this quarter. By entering into resell and repurchase transactions to maturity, as we do in US government securities, we are able to capture arbitrage opportunities in these markets. We believe the market risk to these trades is minimal, as these are held to maturity.

34.     On May 20, 2011, MF Global filed its Form 10-K ("2010 Form 10-K") with the SEC and announced the Firm's financial results for its fiscal year 2010. The 2010 Form 10-K falsely stated, in part, as follows:

> **Risk Management -** We believe that effective risk management is critical to the success of our business and is the responsibility of all of our employees. All of our employees are risk managers. Employees are expected and encouraged to escalate incidents and any matters of concern to management and to our compliance and risk departments in order to effectively manage risk. Consequently, we have established--and continue to evolve and improve--a global enterprise wide risk management framework that is intended to manage all aspects of our risks. The risk-management framework is designed to establish a global, robust risk management environment through a strong governance structure that (i) defines roles and responsibilities, (ii) delegates authority for risk control and risk taking to specific businesses and risk managers, and (iii) documents approved methodologies for the identification, measurement, control and mitigation of risk . . . .
>
> Our Chief Risk Officer, who reports to our President and Chief Operating Officer, leads the risk department and monitors and reports on our risk matters, including regular reports to our Board of Directors and Audit and Risk Committee. The Chief Risk Officer promotes company-wide adherence to MF Global's enterprise risk management framework and has global responsibility for monitoring and facilitating control of market, credit and operational risks.
>
> Senior management takes an active role in the risk management process and expects employees to understand and comply with their delegated risk responsibilities, relevant risk policies, and compliance requirements . . . .
>
> We have multiple sources of liquidity . . . . In addition, we have customer collateral that is not included on our balance sheet but can be re-hypothecated by us, and non-segregated customer payables, both of which may be considered (depending, among other things, on where the collateral is located and the regulatory rules applicable to the collateral) an additional layer of liquidity. Non-segregated customer cash in some jurisdictions is also available for other client liquidity demands which helps mitigate the use of our own cash. We also rely on uncommitted lines of credit from multiple sources to fund our day-to-day execution and clearing operations . . . .
>
> As a matter of policy, we maintain excess capital to provide liquidity during periods of unusual market volatility, which has been sufficient historically to absorb the impact of volatile market events. Similarly, for

our brokerage activities in the OTC markets involving transactions when we act as principal rather than as agent, we have adopted a futures-style margin methodology to protect us against price movements. A futures-style margin methodology allows us to reduce the amount of capital required to conduct this type of business because we are able to post client deposits, rather than our own funds, with clearing organizations or other counterparties, if required. In determining our required capital levels, we also consider the potential for counterparty default on a large transaction, which would require liquidity to cover such default, or a settlement failure due to mismatched settlement instructions. In many cases, other stock or securities can be pledged as collateral for secured lending to guard against such failure. As a result, we are able to execute a substantial volume of transactions without the need for large amounts of working capital.

**Management's Report on Internal Control over Financial Reporting -** Management of MF Global Holdings Ltd. together with its consolidated subsidiaries (the "Company"), is responsible for establishing and maintaining adequate internal control over financial reporting . . . .

The Company's internal control over financial reporting is a process designed under the supervision of the Company's principal executive and principal financial officers to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's consolidated financial statements for external reporting purposes in accordance with accounting principles generally accepted in the United States of America.

Management conducted an assessment of the effectiveness of the Company's internal control over financial reporting as of March 31, 2011 based on the framework established in Internal Control--Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has determined that the Company's internal control over financial reporting as of March 31, 2011 was effective and that there were no material weaknesses in the Company's internal control over financial reporting as of that date.

35.     In addition, Defendants Corzine and Steenkamp falsely certified, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), that the Company's internal controls were safe and effective in SOX certifications about the Company's financial condition. More specifically, the SOX certifications stated that:

(1) I have reviewed this Annual Report on Form 10-K for the fiscal year ended March 31, 2011 of MF Global Holdings Ltd.;

(2) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3) Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

(4) The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures ... for the Registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

(5) The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of Registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting

which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

36.     Substantially identical certifications were signed by defendants Corzine and Steenkamp in the Company's first quarter 2011 Form 10-Q ("1Q 2011 Form 10-Q").

37.     In or around June 2011, the Financial Industry Regulatory Authority (FINRA), a Self-Regulatory Organization with jurisdiction over MF Global, began to express concerns to MF Global that the Firm was not holding adequate capital considering its European sovereign debt holdings.

38.     MF Global management disagreed with FINRA's assessments and entered into extensive talks on this subject with both FINRA and the SEC.

39.     In the midst of MF Global's negotiations with FINRA, on August 3, 2011, the Firm filed its 1Q 2011 Form 10-Q with the SEC.  The 1Q 2011 Form 10-Q falsely stated, in part, as follows:

In accordance with the rules of the FSA in the U.K., the Company's FSA regulated subsidiary, MFGUKL, must comply with the financial resources requirements of the European Union's Capital Requirements Directive. The capital held is intended to absorb unexpected losses and a minimum requirement is calculated in accordance with a standard regulatory formula that addresses the exposure to counterparty credit risk, position/market risk, foreign exchange risk, operational risk and concentration risk. Counterparty risk is calculated as a percentage of unpaid customer margin for exchange traded business and an exposure calculation for off-exchange business. Position risk is calculated by applying percentages to positions based on the underlying instrument and maturity. However, for the purposes of prudential supervision, the Company as a consolidated group, is not subject to the consolidated regulatory capital requirements of the European Union's Capital Requirements Directive.

…

The Company's other regulated subsidiaries are also subject to the respective requirements of other regulatory bodies and exchanges of which they are members in other international locations in which they conduct business. The Company's other regulated subsidiaries were in compliance with all of the respective capital requirements at June 30, 2011 and 2010.

…

The Company has multiple sources of liquidity and expects its primary liquidity needs over the next 12 months to be for working capital, debt service obligations and preferred dividend obligations. Subject to the discussion below regarding its changing liquidity needs as a result of the implementation of its strategic plan, the Company believes it will have sufficient liquidity to meet these obligations given its expected cash flows from operations and its available sources of liquidity . . . . Non-segregated customer cash in certain jurisdictions is also available for other client liquidity demands which helps mitigate the use of the Company's own cash. The Company also relies on uncommitted lines of credit from multiple sources to fund its day-to-day execution and clearing operations.

…

The Company's enterprise risk governance framework involves the oversight of its Board of Directors together with the Company's risk oversight committees, policies and procedures, and defined delegation of authority. The Company's Board-approved risk appetite and strategic objectives translate to defined risk tolerances and oversight processes and, subsequently, strictly enforced delegations of authority and concomitant controls, which are designed to ensure its operation within those risk tolerances.

…

[T]he Company continuously evaluates the levels of regulatory capital at each of its operating subsidiaries and adjusts the amounts of regulatory capital as necessary to ensure compliance with all regulatory capital requirements. Regulatory authorities may increase or decrease these requirements from time to time. The Company also maintains internal early warning levels and excess regulatory capital to accommodate periods of unusual or unforeseen market volatility, and the Company intends to continue to follow this policy. In addition, the Company monitors regulatory developments regarding capital requirements and prepares for increases in the required minimum levels of regulatory capital that may occur in the future. If not properly monitored and adjusted, its regulatory capital levels could fall below the required minimum amounts set by its regulators, which could expose the Company to various sanctions ranging

from fines and censure to partial or complete restrictions on its ability to conduct business.

…

The Company's policy requires it to have sufficient liquidity to satisfy all of its expected cash needs for at least one year without access to the capital markets. In June 2007, the Company entered into a $1,500.0 million five-year revolving unsecured credit facility with a syndicate of banks which was amended in June 2010 to extend the lending commitments of certain borrowers and to change the aggregate commitments under the liquidity facility to $1,200.9 million ($858.9 million of which is undrawn at June 30, 2011). In addition, in June 2011 the Company's U.S. regulated broker-dealer subsidiary, MFGI, entered into a $300.0 million 364-day secured revolving credit facility with a syndicate of lenders, all of which is undrawn at June 30, 2011. To support the business' settlement and intraday requirements, the Company also maintains committed and uncommitted credit lines with financial institutions. The Company anticipates accessing these facilities and credit lines from time to time.

…

Operational risk is the risk of loss or other adverse consequence arising from inadequate or failed internal processes, people and systems or from external events. Consistent with the Company's competitors, its operations are exposed to a broad number of these types of risks which could have a significant impact on its business. The Company further categorizes operational risk as:

* execution, delivery and process management;

* clients, products, and business practices;

* business disruption and systems failures;

* damage to physical assets;

* employment practices and workplace safety;

* financial integrity and reporting;

* internal fraud; and

* external fraud.

…

The Company maintains a continuous and collaborative Operational Risk Management Framework which ensures that an effective environment is in

place to identify, assess, measure, monitor and mitigate operational risk across all of its business areas. The Operational Risk Committee, which is chaired by the Global Head of Operational Risk and is a key component of the Enterprise Risk Management Governance structure, provides oversight of the Operational Risk Management Framework and provides a forum for senior management to assess the operational risk profile of the organization. The Global Head of Operational Risk reports to the Chief Risk Officer. The Operational Risk department is a risk management and assurance function that is independent of the revenue-generating areas. The Operational Risk department's primary objective is to develop, implement, and maintain its Operational Risk Management Framework. The Operational Risk department works with all business areas to help ensure transparency, awareness, and accountability of risks.

As of the end of the period covered by this report, an evaluation was carried out under the supervision and with the participation of the Company's management, including its Chief Executive Officer and Chief Financial Officer, of the effectiveness of its disclosure controls and procedures .... Based upon that evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures were effective as of and for the period covered by this report. In addition, no change in the Company's internal control over financial reporting ... occurred during its most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, its internal control over financial reporting.

40.     On September 1, 2011, MF Global yielded to FINRA's earlier demands and infused additional capital into its securities division to cover the Firm's European sovereign debt positions, as the agency had requested.

41.     On October 24, 2011, Moody's Investors Services ("Moody's) slashed MF Global's credit-rating to Baa3, or nearly junk status, citing the Company's significant risk exposure to European debt.

42.     On October 25, 2011, MF Global reported a $191.6 million quarterly loss.

43.     Also on October 25, 2011, MF Global issued a press release announcing its second quarter 2011 financial results. In the release, MF Global falsely stated, in part, as follows: "**Strengthened capital and liquidity position**. As of September 30, 2011,

the company has over $3.7 billion in available liquidity, including $1.3 billion in

available committed revolving credit facilities and $2.5 billion in total capital."

      44.    In addition, Defendant Corzine falsely noted that:

> Reflecting the stressed markets in the quarter, we deliberately
> chose to reduce overall market exposure in most principal trading
> activities and focused on preserving capital and liquidity ... We
> were particularly pleased with the repositioning of our mortgage,
> credit and foreign exchange businesses; the performance of our
> commodities group; and the common alignment of our brand to
> strategy. These efforts reflect positively on our ability to execute
> and deliver competitive returns to shareholders in the quarters
> ahead.... Over the course of the past year, we have seen
> opportunities in short-dated European sovereign credit markets and
> built a fully financed, laddered maturity portfolio that we actively
> manage. We remain confident that we have the resources and
> expertise to continue to successfully manage these exposures to
> what we believe will be a positive conclusion in December 2012.

      45.    In the same release, Defendant Steenkamp falsely stated that: "In addition,

the steps we've taken over the past year to improve our capital and liquidity positions are

of immense value in periods of uncertainty and volatility. As a result, we are a stronger

firm today with more flexibility to focus on our strategy."

      46.    Also on October 25, 2011, on a conference call discussing the second

quarter 2011 financial results, Defendant Corzine stated: "In short, the strategic actions

taken over the past six quarters are significant and position our firm to grow revenues on

a reduced cost basis, under less stressful market conditions.  We are confident we have

built a substantial capacity for growth and earnings."

      47.    Each of the statements and public releases quoted above was materially

false and misleading when made because: (1) MF Global was suffering from serious

liquidity pressures based on its exposure to the European debt crisis; (2) MF Global's

internal controls were highly deficient and were unable to clearly segregate clients'

funds; and (3) Defendants failed to disclose that MF Global's true risk profile would

inevitably lead to a credit rating downgrade.

48.     On October 27, 2011, Moody's and Fitch Rating's Ltd. ("Fitch")

downgraded MF Global's credit-rating to junk status. Fitch released a statement regarding

the downgrade that read, in part, as follows:

> In addition, [MF Global's] increase in principal and, to a lesser extent,
> proprietary trading activities has elevated the firm's traditional risk profile.
> These increased risk taking activities have resulted in sizeable
> concentrated positions relative to the firm's capital base, leaving MF
> vulnerable to potential credit deterioration and/or significant margin calls.
> While Fitch notes that the firm has made some progress in rationalizing its
> capital structure, the firm's persistently weak earnings and leverage are no
> longer consistent with an investment grade financial institution.

49.     Up until its bankruptcy on October 31, 2011, MF Global specifically

represented to its customers that the Firm would maintain segregated customer accounts

via a publication titled "Protecting Your Assets at MF Global."  This document states, in

relevant part:

> MF Global enforces a strict policy on the segregation of
> funds so that your assets may not serve as capital for MF
> Global's own financial obligations.  We preserve the
> distinction between your assets and ours by holding your
> cash and securities within special reserve bank accounts
> established for the exclusive benefit of clients. Exacting
> accounting standards and internal supervision protocols
> govern these accounts to protect the integrity of client
> assets and separate them from those of MF Global.

50.     <u>Conversion and Commingling of Customer Funds</u>.  Futures commission

merchants are prohibited from commingling customer account funds with their own

funds, and are required to keep customer funds segregated and separately accounted for both by statute, 7 U.S.C. § 6d(a)(2), and regulation, 17 C.F.R. 1.20.

51.     Chicago Mercantile Exchange rules similarly prohibit the commingling of customer account funds with a broker's own funds.

52.     CFTC regulation 17 C.F.R. 1.25 does allow futures commission merchants to borrow from customer accounts within certain guidelines.  Specifically, any money brokers borrow must be replaced with reliable and sound assets like U.S. Treasury securities, and then only in limited quantities.

53.     As MF Global's credit rating was slashed, its investors and customers began to withdraw funds and the value of its European sovereign debt holdings continued to decline, the Firm faced increasing difficulties meeting its mounting debts stemming from investments made on behalf of the Firm.

54.     Press reports indicate that Defendant Corzine was made aware as early as September 2011 that MF Global had insufficient funds to cover its debts.

55.     On October 26, 2011, Defendant O'Brien personally oversaw and directed a $165 million transfer of MF Global segregated customer account funds to MF Global's proprietary trading account with J.P. Morgan.  All other Individual Defendants were aware and approved of this transfer.

56.     Following the October 26, 2011 transfer, Individual Defendants became aware of a shortfall in MF Global customer accounts.

57.     On October 27, 2011, MF Global deposited an unknown amount of money with the Depository Trust & Clearing Corporation, a clearing corporation, to cover a margin call.   A portion of these funds came from MF Global customer accounts.

58.     At a December 13, 2011 Senate Agriculture, Nutrition and Forestry Committee hearing, CME Executive Chairman Terrence Duffy testified that following MF Global's credit rating cut, CME auditors investigated the state of MF Global's customer accounts.  On October 27, 2011 MF Global reported to CME, in a "daily segregation report," that there was roughly $200 million in excess funds in its customer accounts.

59.     CME Chairman Duffy further testified that on October 31, 2011, MF Global retroactively revised this report to indicate that there was a roughly $200 million deficit in the Firm's customer accounts as of October 27, 2011.

60.     J.P. Morgan's Role.  As MF Global grappled with a shortage of funds, the Firm's line of credit with J.P. Morgan was at some point overdrawn by about $200 million.

61.     MF Global sought to raise funds by selling securities with J.P. Morgan acting as middleman.  J.P. Morgan, however, refused to execute the trades until MF Global paid back the roughly $200 million account deficit with the Bank.

62.     On October 28, 2011, Defendant Corzine called Defendant O'Brien and told her that there was an overdraft in MF Global's J.P. Morgan trading account.  He told Defendant O'Brien that unless the overdraft was remedied, J.P. Morgan would not execute any additional trades on behalf of MF Global.

63.     Following Defendant O'Brien's conversation with Defendant Corzine, Defendant O'Brien sent out an email to a group of MF Global colleagues stating, "I need $175 mm sent immediately."

64.     On October 28, 2011, Defendant O'Brien personally oversaw and directed a $175 million transfer from MF Global segregated customer account funds to the Firm's J.P. Morgan account to cover the overdraft.  All other Individual Defendants were aware and approved of this transfer.

65.     MF Global kept its segregated customer accounts at J.P. Morgan.  When MF Global transferred the funds to J.P Morgan, the Bank knew that the money was coming from the segregated customer accounts.

66.     J.P. Morgan also knew about the statutes and regulations that required MF Global to keep its customer funds segregated.

67.     On October 29, 2011, J.P. Morgan took the unusual step of sending a letter to MF Global seeking assurances that the Firm's $175 million transfer had not violated CFTC rules, and that the money had not been taken from segregated customer accounts.

68.     It is unclear why J.P. Morgan sent this letter, because, as MF Global's banker, J.P. Morgan knew that the customer funds kept with the Bank were segregated customer funds.

69.     At a December 8, 2011 House Agriculture Committee hearing, Defendant Corzine testified that MF Global staff, specifically Defendant O'Brien, provided assurances to J.P. Morgan that the transfer was proper.

70.     Following J.P. Morgan's request, Defendant O'Brien met with MR Global's general counsel, Laurie Ferber, and assistant general counsel, Dennis Klejna, to discuss her signing off on the letter assuring J.P. Morgan that the $175 million transfer had not come from segregated customer accounts.

71.     Defendant O'Brien and MF Global's counsel could not come to an agreement on the wording of a letter providing J.P. Morgan with assurances that the transfer had not come from segregated customer accounts, and Defendant O'Brien did not sign any letter to J.P. Morgan.

72.     J.P. Morgan then sent a revised letter addressed to Defendant O'Brien requesting assurances that the $175 million transfer had not come from segregated customer accounts.  Defendant O'Brien did not sign this second letter either.

73.     Thus, J.P. Morgan did not receive any written assurance about the legality of MF Global's $175 million payment to address the Firm's J.P. Morgan trading account overdraft.

74.     Even if J.P. Morgan had received some assurance from MF Global about the legality of the transfer, the Bank already knew that the transfer was coming from the segregated customer accounts because J.P. Morgan was in control of those accounts.

75.     Despite J.P. Morgan's knowledge of the money's origin, the Bank facilitated and assisted MF Global in making the $175 million payment knowing it was from segregated customer accounts.

76.     Though J.P. Morgan was aware of the illegal actions MF Global was taking towards its customers, the Bank did not warn customers, regulators, or law enforcement about the Firm's illegal conversion or fraud.

77.     <u>The Regulators Become Involved.</u>  MF Global, by undertaking these transfers to the Depository Trust & Clearing Corporation and J.P. Morgan, and in paying off other MF Global debts, the Individual Defendants, commingled and converted customer account funds from its commodities and futures brokerage.

78.     On Sunday, October 30, 2011, the CFTC informed the CME that there was a $900 million deficit in MF Global's customer accounts as of close of business on Friday, October 28, 2011.

79.     MF Global representatives assured the CFTC and the CME that the $900 million deficit was merely an accounting error.

80.     On October 31, MF Global representatives informed the CFTC and the CME that the shortfall was not the result of an accounting error, and that the Firm had actually transferred customer funds out of their segregated accounts.

81.     At a December 13, 2011 Senate Agriculture, Nutrition and Forestry Committee hearing, CME Executive Chairman Terrence Duffy testified that Defendant Corzine knew that customer funds were being used in money transfers that occurred in the week before MF Global's bankruptcy.

82.     Bankruptcy.  On October 31, 2011, MF Global filed for Chapter 11 protection in the U.S. Bankruptcy Court for the Southern District of New York.

83.     Following MF Global's bankruptcy, the CME froze MF Global's commodities and futures accounts, and moved to transfer these customer accounts to other brokers.

84.     On Nov. 6, 2011, CME issued a notice of "hold" to its brokers for accounts transferred from MF Global, saying it was verifying the collateral allocated to each customer involved in the bulk transfer of positions from the brokerage.

85.     Missing Funds.  Following MF Global's bankruptcy filing, the court appointed Bankruptcy Trustee, regulators, and others reported a shortfall in the funds the

Firm was supposed to have kept segregated from its own funds.  This shortfall is estimated to be as high as $1.2 billion.

86.    <u>Plaintiffs' Actions.</u>  On October 24, 2011, Plaintiff Pierce attempted to withdraw $20,000 from his MF Global account.  MF Global confirmed the withdrawal, and Plaintiff's account summary confirms that the funds were debited from his account. Plaintiff received a check from MF Global for $20,000, however, when Plaintiff tried to deposit the check – it bounced.

87.    On November 1, 2011, Plaintiff Bartell learned that his MF Global customer account had been frozen and that he would not be able to withdraw, transfer, or otherwise make use of his funds in that account.

88.    On November 1, 2011, Plaintiff Damouni learned that the funds she was seeking to be returned from her MF Global customer account had been frozen.

## <u>CLASS ALLEGATIONS</u>

89.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the federal rules of Civil Procedure on behalf of the following class:

> All customers with MF Global futures or commodities trading accounts that were subject to the Chicago Mercantile Exchange's freeze following MF Global's bankruptcy and/or whose futures or commodities trading accounts are missing funds following MF Global's bankruptcy.

90.    **Numerosity**.  The proposed class is so numerous that the individual joinder of all members is impracticable.  While the exact number of members of the class as herein defined and described is unknown to Plaintiffs at this time, Plaintiffs believes

the class of MF Global customers whose accounts were frozen by the Chicago Mercantile Exchange is in the tens of thousands.

91.    **Adequacy of Representation**.  The Plaintiff class' representative parties will fairly and adequately protect the interests of the Class.  Plaintiffs have no interests adverse to those of the class.  Undersigned counsel is very experienced in class actions and complex litigation of this kind, and well-qualified to pursue this litigation vigorously and fully.

92.    **Commonality**.  Questions of law or fact exist arising from the Defendants' billing scheme and related conduct.  Such questions are common to all class members and predominate over any questions affecting only individual members of the class.  The myriad of questions of law or fact common to the class, includes, *inter alia*:

a.   Whether Individual Defendants made misleading statements about MF Global's financial health;

b.   Whether Individual Defendants made any materially misleading statements regarding the financial health of the Firm;

c.   Whether Individual Defendants intended that the class rely upon such misleading statements;

d.   Whether Individual Defendants used or employed any deception or fraud, when misrepresenting the Firm's financial condition;

e.   Whether Individual Defendants converted and commingled funds from customer commodities and futures accounts;

f.   Whether Defendant J.P. Morgan aided and abetted the Individual Defendants in their tortious acts;

    g.   Whether all Defendants engaged in a pattern of racketeering activity;

    h.   Whether class members have been damaged and, if so, what is the

        proper measure of damages; and

    i.   Whether the actions complained of herein justify an award of punitive

        damages.

93.    **Appropriateness**.  This class litigation is a superior method for the fair and efficient adjudication of the claims involved.  Most class members customer claims are too small to economically support the pursuit of their claims on an individual basis.

## CAUSES OF ACTION

### Count I—Consumer Fraud Act

94.    Plaintiffs repeat and re-allege paragraphs 1 through 93, as if fully set forth herein.

95.    At all relevant times there was in full force and effect the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*. (the "Consumer Fraud Act") and similar deceptive practice acts in other states.

96.    Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, provides, in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.  In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and

the federal courts relating to Section 5(a) of the Federal Trade Commission Act.  (footnotes omitted)

97.     Individual Defendants have violated the Consumer Fraud Act by engaging in the following unfair and deceptive acts and practices:

    a.  Publishing specific assurances to customers that MF Global would keep customer account funds segregated from the Firm's funds;

    b.  Filing forms with the SEC that contained misleading statements about the financial condition of the Firm;

    c.  Issuing press releases and making other public statements containing misleading information about the financial condition of the firm;

    d.  Providing public assurances to customers that the Firm would not commingle or convert segregated customer accounts; and

    e.  Commingling and converting customer commodity and futures account funds for their own benefit in violation of federal statutes and regulations.

98.     The Individual Defendants' representations are unlawful and amount to unfair and/or deceptive acts or practices which violate Section 2 of the Consumer Fraud Act.

99.     Individual Defendants' actions described herein similarly violated the consumer protection statutes in effect in every state in which Individual Defendants or their affiliates do business.

100.     Section 10a of the Consumer Fraud Act, 815 ILCS 505/10a, and similar provisions in the Consumer Fraud Acts of other jurisdictions within the United States, provide, in pertinent part:

    (a)     Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person.  The court, in its discretion, may award

actual economic damages or any other relief which the court deems proper…

* * *

(b)      Except as provided in subsection (f), (g), and (h) of this Section, in any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party.

101.    Plaintiffs and Plaintiff class relied upon MF Global's misrepresentations as to the Firm's security, solvency and legal handling of their discounts and money in choosing to open, operate and continue to maintain their commodities and futures trading accounts with the Firm.

102.    As a direct and proximate result of these violations, Plaintiffs and the class have suffered pecuniary damages, for which they should be compensated, including, but not limited to damages for the funds that are currently missing from their accounts, plus attorneys' fees and costs of this litigation.

## Count II—Violation of the Commodity Exchange Act
### (7 U.S.C. § 6b(a)(2) - Fraud)

103.    Plaintiffs repeat and re-allege paragraphs 1 through 102 as if set forth herein.

104.    The Commodity Exchange Act makes it illegal for any person to "to cheat or defraud or attempt to cheat or defraud," 7 U.S.C. § 6b(a)(2)(A); "willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record," § 6b(a)(2)(B); or, "willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract," § 6b(a)(2)(C).

105.    The Commodity Exchange Act also imparts liability to control persons who willfully aid or abet such fraudulent acts, 7 U.S.C § 13c(a):

> Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or committed by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

106.    Individual Defendants have violated the Commodity Exchange Act's anti-fraud provisions by:

    a.  Publishing specific assurances to customers that MF Global would keep customer account funds segregated from the Firm's funds;

    b.  Filing reports with the SEC that contained false and misleading statements about the financial condition of the Firm;

    c.  Issuing press releases and making other public statements containing false and misleading information about the financial condition of the Firm;

    d.  Providing public assurances to customers that the Firm would not commingle or convert segregated customer accounts; and

    e.  Commingling and converting customer commodity and futures account funds for their own benefit in violation of federal statutes and regulations.

107.    The Individual Defendants' representations and actions were designed to defraud or mislead Plaintiff and class members and violate Section 6b of the Commodity Exchange Act.

108.    The Commodity Exchange Act provides for a private right of action for violations of the Act:

> Any person . . . who violates this chapter or who willfully
> aids, abets, counsels, induces, or procures the commission
> of a violation of this chapter shall be liable for actual
> damages . . .

Private rights of action, 7 U.S.C. § 25.

109.    Plaintiffs and Plaintiff class relied upon MF Global's representations when choosing to open and operate commodities and futures trading accounts with the Firm.

110.    As a direct and proximate result of these violations, Plaintiffs and the class have suffered pecuniary damages, for which they should be compensated, including, but not limited to damages for the funds that are currently missing from their accounts, plus attorneys' fees and costs of this litigation.

### Count III—Violation of the Commodity Exchange Act
### (7 U.S.C. § 6d(a)(2) & 17 C.F.R. 1.20 – Commingling and Converting Customer Funds)

111.    Plaintiffs repeat and re-allege paragraphs 1 through 110 as if fully set forth herein.

112.    The Commodity Exchange Act explicitly prohibits the commingling of customer account funds with broker funds:

> [Customer] money, securities, and property shall be
> separately accounted for and shall not be commingled with
> the funds of such commission merchant or be used to
> margin or guarantee the trades or contracts, or to secure or
> extend the credit, of any customer or person other than the
> one for whom the same are held . . .

7 U.S.C. § 6d(a)(2); *see also* 17 C.F.R. 1.20.

113.    Again, the Commodity Exchange Act imparts liability to control persons who orchestrate and aid such acts, and provides for a private right of action in such cases.  7 U.S.C. §§ 13c(a), 25.

114.    Individual Defendants directed the conversion and commingling of Plaintiffs' and class members' customer account funds with the Firm's own funds in violation of the Commodity Exchange Act.

115.    J.P. Morgan assisted in and facilitated this conversion by the Individual Defendants.

116.    As a direct and proximate result of these violations, Plaintiffs and the class have suffered pecuniary damages, for which they should be compensated, including, but not limited to damages for the funds that are currently missing from their accounts, plus attorneys' fees and costs of this litigation.

## Count IV—Breach of Fiduciary Duty

117.    Plaintiffs repeat and re-allege paragraphs 1 through 116 as if fully set forth herein.

118.    Brokers owe a fiduciary duty to their customers in handling customers' money and accounts.  Individual Defendants, as managers of broker MF Global, owed a fiduciary duty to Plaintiff and class members.

119.    By converting and commingling funds from Plaintiffs' and class members' commodities and futures accounts, and by using these funds for the Firm's own purposes, Individual Defendants breached their fiduciary duties to Plaintiffs and class members.

120.    As a direct and proximate result of these violations, Plaintiffs and the class have suffered pecuniary damages, for which they should be compensated, including, but not limited to damages for the funds that are currently missing from their accounts, plus attorneys' fees and costs of this litigation.

## Count V—Conversion

121.    Plaintiffs repeat and re-allege paragraphs 1 through 120 as if fully set forth herein.

122.    Individual Defendants and their agents have converted funds owed to the Plaintiffs and the class members by illegally withdrawing funds from customer accounts, and using these funds to pay off the Firm's debtors, other entities that demanded margin calls, and by paying off other MF Global customers who withdrew their funds prior to the bankruptcy.

123.    These acts constitute an unauthorized taking by the Individual Defendants, into their possession, of funds owed to the Plaintiffs and the class members.  These acts were committed by Individual Defendants with the intent, at the time of taking, to appropriate these funds.

124.    As a direct and proximate result of these violations, Plaintiffs and the class have suffered pecuniary damages, for which they should be compensated, including, but not limited to damages for the funds that are currently missing from their accounts, plus attorneys' fees and costs of this litigation.

125.    In addition, the conversion committed by Individual Defendants was willful and malicious.  Plaintiffs will demonstrate that they have incurred significant expenses in the investigation and prosecution of this action.  Defendants' conduct warrants an imposition of punitive damages in this case.

## Count VI—Aiding and Abetting Conversion

126.    Plaintiffs repeat and re-allege paragraphs 1 through 125 as if fully set forth herein.

127.    All Defendants knew about the conversion of funds from Plaintiffs and Plaintiff class segregated customer funds, and that such a conversion was illegal.

128.    All Defendants ordered, facilitated, assisted, or knowingly executed transactions through which Plaintiff and Plaintiff class customer account funds were converted.

129.    As a direct and proximate result of these violations, Plaintiffs and the class have suffered pecuniary damages, for which they should be compensated, including, but not limited to damages for the funds that are currently missing from their accounts, plus attorneys' fees and costs of this litigation.

## Count VII—Common Law Fraud

130.    Plaintiffs repeat and re-allege paragraphs 1 through 129 as if fully set forth herein.

131.    Individual Defendants, and their affiliates, intended to deceive Plaintiffs and class members to believe that MF Global's financial condition was sound, when Defendants had information to the contrary.

132.    Plaintiffs and class members relied upon Individual Defendants' representations that MF Global was in sound financial condition and was capable of managing their commodities and futures accounts, and that MF Global could honor withdrawals of customer account funds.

133.    As a direct and proximate result of these violations, Plaintiffs and the class have suffered pecuniary damages, for which they should be compensated, including, but not limited to damages for the funds that are currently missing from their accounts, plus attorneys' fees and costs of this litigation.

134.    In addition, the fraud committed by Individual Defendants was willful and malicious.  Plaintiffs will demonstrate that they have incurred significant expenses in the investigation and prosecution of this action.  Defendants' conduct warrants an imposition of punitive damages in this case.

## Count VIII—Aiding and Abetting Fraud

135.    Plaintiffs repeat and re-allege paragraphs 1 through 134 as if fully set forth herein.

136.    All Defendants knew about the deceptions and misrepresentations concerning MF Global's financial condition.

137.    All Defendants knew that the deceptions and misrepresentations constituted a fraud upon the Plaintiffs and Plaintiff class, and that such a conversion was illegal.

138.    All Defendants facilitated, assisted in, or knowingly contributed to the fraud being committed upon the Plaintiffs and Plaintiff class.

139.    As a direct and proximate result of these violations, Plaintiffs and the class have suffered pecuniary damages, for which they should be compensated, including, but not limited to damages for the funds that are currently missing from their accounts, plus attorneys' fees and costs of this litigation.

## Count IX—Pattern of Racketeering Activity

140.    Plaintiffs repeat and re-allege paragraphs 1 through 139 as if fully set forth herein.

141.    Section 1964 of the RICO statute states in relevant part:

> "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."

18 U.S.C. § 1964(c).

142.    Section 1962 of the RICO statute states in relevant part:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly in the conduct of such

enterprise's affairs through a pattern of racketeering
activity or collection of unlawful debt.

18 U.S.C. § 1962.

143.    Section 1961 of the RICO statute includes the following relevant definitions:

(1) "racketeering activity" means . . . (B) any act which is
indictable under any of the following provisions of title 18
United States Code: . . . section 1341 (relating to mail
fraud), section 1343 (relating to wire fraud), section 1344
(relating to financial institution fraud), . . . section 1957
(relating to engaging in monetary transactions in property
derived from specified unlawful activity), . . . sections 2314
and 2315 (relating to interstate transportation of stolen
property) . . . .

(4) "enterprise" includes any individual, partnership,
corporation, association, or other legal entity, any union or
group of individuals associated in fact although not a legal
entity . . . .

(5) "pattern of racketeering activity" requires at least two
acts of racketeering activity, one of which occurred after
the effective date of this chapter and the last of which
occurred within ten years . . . after the commission of a
prior act of racketeering activity . . . .

18 U.S.C. § 1961.

144.    MF Global, considered the parent company together with its affiliated and

controlled subsidiaries is an enterprise, as defined by 18 U.S.C. § 1961(4).

145.    All Defendants were employed by or were associated with MF Global.

146.    All Defendants conducted MF Global's brokerage and commodity subsidiaries

business with customers by a pattern of racketeering activity, and engaged in at least two acts of

the following racketeering activities:

a.  Mail Fraud, 18 U.S.C. 1341.  Defendants made and published false and

misleading statements about the financial well-being of MF Global, about the

security of customers' segregated accounts, and about the funds available in customer accounts.  Defendants published these statements to Plaintiffs and Plaintiff class through mailings to customers via the U.S. postal service.  The Defendants' false statements were part of a scheme to keep customers from withdrawing money from their accounts or switching to a different commodities broker, and ultimately so that Defendants could convert customer funds to their own uses;

b.   Wire Fraud, 18 U.S.C. 1343.  Defendants made and published false and misleading statements about the financial well-being of MF Global, about the security of customers' segregated accounts, and about the funds available in customer accounts.  Defendants published these statements to Plaintiffs and Plaintiff class via internet transmissions (interstate wire communications) of statements and account information to customers.  The Defendants' false statements were part of a scheme to keep customers from withdrawing money from their accounts or switching to a different commodities broker, and enabled Defendants to convert customer funds to their own uses, and delay the discovery of the conversion;

c.   Financial Institution Fraud, 18 U.S.C. 1344, Defendants actions to convert the funds from customers segregated accounts was part of a scheme to obtain funds under the custody J.P. Morgan.  The Defendants accomplished this fraud by making false representations and promises to regulators and to customers about the balances of their accounts.

    d.   Engaging in monetary transactions in property derived from specified

         unlawful activity, 18 U.S.C. 1957.  Defendants illegally assisted in or directly

         withdrew and converted money from segregated customer accounts.

         Defendants then engaged in monetary transactions using these illegally

         garnered funds.

    e.   Interstate Transportation of Stolen Property, 18 U.S.C. 2314, 2315.

         Defendants assisted in or directly transferred the stolen customer funds across

         state lines.

147.    Plaintiffs and Plaintiff class were harmed by the Individual Defendants' conduct of the MF Global enterprise by the above-described patterns of racketeering activities.  Plaintiffs and Plaintiff class suffered pecuniary damages therefrom, for which they should be compensated, including, but not limited to damages for the funds that are currently missing from their accounts.

148.    Plaintiffs and Plaintiff class are entitled to recover threefold the damages sustained and the costs of the suit, including reasonable attorneys' fees.


**<u>Count X—RICO Conspiracy</u>**

149.    Plaintiffs repeat and re-allege paragraphs 1 through 148 as if fully set forth herein.

150.    Section 1962 of the RICO statute states in relevant part:

    (c) It shall be unlawful for any person employed by or
    associated with any enterprise engaged in, or the activities
    of which affect, interstate or foreign commerce, to conduct
    or participate, directly or indirectly in the conduct of such
    enterprise's affairs through a pattern of racketeering
    activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate
any of the provisions of subsection . . . (c).

18 U.S.C. § 1962.

151.    The Defendants all conspired to violate the RICO statute as detailed in Count IX.

152.    Plaintiffs and Plaintiff class were harmed by the racketeering activities of the

Defendants and suffered pecuniary damages, for which they should be compensated, including,

but not limited to damages for the funds that are currently missing from their accounts.

153.    Plaintiffs and Plaintiff class are entitled to recover threefold the damages

sustained and the cost of the suit, including reasonable attorneys' fees.


### Count XI—Aiding and Abetting the RICO Conspiracy

154.    Plaintiffs repeat and re-allege paragraphs 1 through 153 as if fully set forth herein.

155.    Section 1962 of the RICO statute states in relevant part:

(c) It shall be unlawful for any person employed by or
associated with any enterprise engaged in, or the activities
of which affect, interstate or foreign commerce, to conduct
or participate, directly or indirectly in the conduct of such
enterprise's affairs through a pattern of racketeering
activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate
any of the provisions of subsection . . . (c).

18 U.S.C. § 1962.

156.    The Defendants all aided and abetted the conspiracy to violate the RICO statute

by directly or indirectly conducting MF Global's affairs in an illegal manner as detailed in

Counts  IX and X.

157.    Plaintiffs and Plaintiff class were harmed by the racketeering activities of the Defendants and suffered pecuniary damages, for which they should be compensated, including, but not limited to damages for the funds that are currently missing from their accounts.

158.    Plaintiffs and Plaintiff class are entitled to recover threefold the damages sustained and the cost of the suit, including reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

159.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and the Seventh Amendment of the Constitution, Plaintiffs demand a trial by jury for all issues that are so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for the following relief:

A.    Certify that this action may be maintained as a class action under Rule 23(a)( and (b)(3) of the Federal Rules of Civil Procedure for a class defined as , or such other class the court determines appropriate under the circumstances;

B.    Designate Plaintiffs as class representatives and appoint class counsel;

C.    A declaration that Defendants' conduct violates the law as alleged in each cause of action;

D.    Judgment for the Plaintiff and the class for restitution and/or compensatory damages sustained as a result of the Defendants' conduct;

E.    Reasonable attorneys' fees;

F.    Treble damages under the Civil RICO counts;

G.      Punitive damages; and

H.      Such other legal or equitable relief as the Court deems just and proper.


Dated: February 24, 2012                              RESPECTFULLY SUBMITTED,


                                                      /s/ Clinton A. Krislov_____
                                                      Attorney for Plaintiff


Clinton A. Krislov
Eli Korer
KRISLOV & ASSOCIATES, LTD.
20 N. Wacker, Suite 1350
Civic Opera House
Chicago, Illinois 60606
(312) 606-0500